UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                           :

TRACY L. EDMONDS            :                 3:18 CV 1401 (RMS)
                           :

V.                                :
                           :

ANDREW SAUL,            :
COMMISSIONER OF      :
SOCIAL SECURITY[1]      :                 DATE: DECEMBER 4, 2019
                           :
------------------------------------------------------ x

RULING ON THE PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF
THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

disability insurance benefits ["DIB"] and Supplemental Security Income ["SSI"].

I.      ADMINISTRATIVE PROCEEDINGS

On October 7, 2013, the plaintiff filed applications for DIB and SSI, claiming she had been

disabled since June 1, 2007, due to endometriosis, fibromyalgia, arthritis, COPD, high blood

pressure, diabetes and a heart murmur. (Certified Transcript of Administrative Proceedings, dated

December 6, 2018 ["Tr."] 343-58, 271). The plaintiff's application was denied initially (Tr. 271-

78) and upon reconsideration. (Tr. 283-89).  On June 30, 2015, a hearing was held before

Administrative Law Judge ["ALJ"] Eskunder Boyd, at which the plaintiff and a vocational expert

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security.  (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d).  The Clerk of the Court shall amend the caption in this case as indicated above.

testified. (Tr. 182-223). The plaintiff was represented by two attorneys at the hearing. (*Id.*). On September 14, 2015, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 7-24). On November 3, 2015, the plaintiff filed a request for review of the hearing decision (Tr. 39), and on December 16, 2016, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On August 17, 2018, the plaintiff filed her complaint in this pending action (Doc. No. 1), and on October 30, 2018, the defendant filed his answer and administrative transcript. (Doc. Nos. 22, 23). On December 5, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge; the case was transferred to Magistrate Judge Donna F. Martinez. (Doc. No. 27). On December 6, 2018, the defendant filed an amended administrative transcript. (Doc. No. 28). The plaintiff filed her Motion for Judgment on the Pleadings on December 27, 2018, (Doc. No. 29), and brief in support. (Doc. No. 30 ["Pl.'s Mem."]). On February 19, 2019, the defendant filed his Motion to Affirm (Doc. No. 31), and brief in support. (Doc. No. 31-1 ["Def.'s Mem."]). The plaintiff filed a Reply to the defendant's Motion to Affirm on February 25, 2019. (Doc. No. 33). On October 10, 2019, this case was reassigned to this Magistrate Judge. (Doc. No. 34).

For the reasons stated below, the plaintiff's Motion for Judgment on the Pleadings (Doc. No. 29) is *denied*, and the defendant's Motion to Affirm (Doc. No. 31) is *granted.*

II.    <u>FACTUAL BACKGROUND</u>

A.    <u>HEARING TESTIMONY</u>

As of the date of her hearing in 2015, the plaintiff was forty-four years old, living with her husband, two sons, sister, and her sister's children in a first-floor apartment in Danbury, CT. (Tr. 189). Her average weight was 196 pounds. (Tr. 190). The plaintiff testified that she used a

prescribed cane to "keep [her] stable" and "help[] her [] walk." (*Id.*). At the time of the hearing, she had been using the cane for "about a year and a half." (*Id.*).

The plaintiff's last job was as a substitute teacher's aide. (Tr. 192). For that job, which she held in 2013, she worked "about 20" hours per week. (*Id.*). Her last full-time position was in 2012, at which time she worked as a "teacher's aide, and also a gas station clerk." (*Id.*). Her normal day, at the time of the hearing, consisted of staying in the house unless she had a doctor's appointment. (Tr. 195). She testified that she could manage her own money, keep a bank account, and pay her bills. (Tr. 191-92). She could groom and bathe herself, although she had difficulty standing in the shower. (Tr. 193). She also tried to perform household chores, such as washing dishes and cooking, but she could only stand for "about two minutes." (Tr. 193-94). She testified that she wears glasses, but that they did not help with her vision. (Tr. 191). According to the plaintiff, she was in the process of scheduling cataract surgery. (Tr. 205). She was able to see street signs but not the print on a newspaper. (Tr. 190-91). The plaintiff testified that she only drove "maybe about ten miles" a week, (Tr. 194), and could be "behind the wheel" no longer than thirty minutes at a time. (Tr. 195). The plaintiff's sister accompanied her to the grocery store. (*Id.*). She would remain in the "mobile cart" while her sister pushed the cart of groceries. (*Id.*).

According to the plaintiff, she was disabled due to diabetes, neuropathy, and fibromyalgia. (Tr. 196). She testified that her medications made her very tired, and that "everything" aggravated her pain. (*Id.*). She rated an average day's pain as a nine out of ten, or an eight out of ten with medication. (Tr. 197). The plaintiff testified that she could not sit for a long time, could not stand for a long time, could not walk for a long time without getting shortness of breath, and could not lift. (*Id.*). She testified that, "on a good day," she could lift "maybe a pound," (Tr. 200), and that she could carry "maybe about five pounds." (Tr. 201). She testified that she could not carry a half

gallon of milk from the cooler in the grocery store to the cashier. (*Id.*). According to the plaintiff, she could walk one city block before getting short of breath. (*Id.*). She could stand for only two minutes at a time and could sit for "maybe twenty minutes" at a time. (Tr. 202). After sitting for twenty minutes, she would have to lay down, and when laying down, would have to wait for fifteen minutes before adjusting her position. (*Id.*). The plaintiff could not bend over to touch her toes, but she could bend over to touch her knees. (*Id.*). She could not squat. (Tr. 203). She could climb stairs or ramps with the help of a guardrail. (*Id.*). She could reach her arms over her head and directly in front of her, as well as use her fingers for both smaller things, *i.e.*, buttons, zippers, and larger things, *i.e.*, an orange. (*Id.*). She could not shuffle and deal a deck of cards. (*Id.*). The plaintiff also testified that temperatures, both hot and cold, aggravated her symptoms, as did humidity and rain. (Tr. 203-04). She was also sensitive to odors, fumes and dusts. (Tr. 204).

A vocational expert ("VE") testified at the plaintiff's hearing that the plaintiff's past work as a customer service representative in a call center corresponded with a "hybrid" of both order clerk and telephone solicitor, occupations performed at the sedentary exertional level, (Tr. 213), and that her past work as a teacher's aide corresponded with teacher aide II, an occupation typically performed at the light exertional level but performed at the medium exertional level as reported by the plaintiff. (Tr. 214). The ALJ then asked the VE to assume the following hypothetical individual: an individual of the plaintiff's age, education, and vocational background, limited to performing light work, but with limits of standing and walking for two to four hours and sitting for up to six hours. (*Id.*). Such individual would also require an option where she would be able to sit for thirty minutes, alternate to a standing position for five minutes, and then resume sitting. (*Id.*). Such individual would have the additional limitations of never climbing ladders, ropes, or scaffolds, never kneeling or crawling, occasionally climbing stairs and ramps, and occasionally

balancing, stooping and crouching. (Tr. 215). She could frequently handle and finger, but could not work with exposure to temperature extremes, humidity or wetness. (*Id.*).

In response to questioning, the VE testified that the hypothetical individual described above could perform the plaintiff's past work in the call center. (*Id.*). The ALJ then asked the VE whether the hypothetical individual, if she required a cane for ambulation, could perform the plaintiff's past work. (*Id.*). The VE again testified that such an individual could perform the plaintiff's past work in the call center. (*Id.*). For the next hypothetical, the ALJ kept all the limitations described above, but instead of light work, limited the hypothetical individual to sedentary work. (*Id.*). The VE testified that such an individual could perform the plaintiff's past work in the call center. (Tr. 216). However, if the hypothetical individual, limited to sedentary work, with all the other limitations described above, could only occasionally handle and finger, that individual could not perform the plaintiff's past work or other jobs in the national economy. (Tr. 216-17). Similarly, the VE testified that if the hypothetical individual had to alternate to a reclining position for fifteen minutes after thirty minutes of sitting, the individual could not perform the plaintiff's past relevant work or any other jobs in the national economy. (Tr. 216). Finally, the ALJ asked the VE whether an individual limited to frequent close visual acuity and occasional far visual acuity would be able to perform the plaintiff's past work in the call center. (Tr. 219). The VE answered in the affirmative. (Tr. 220). The VE testified, however, that, if the individual was limited to occasional close visual acuity and occasional far visual acuity, his "understanding . . . is that your near acuity is going to be required at least on a frequent level." (Tr. 221).

B.     MEDICAL HISTORY

The Court presumes the parties' familiarity with the plaintiff's medical history, which is

discussed in the parties' Joint Statement of Facts. (Doc. No. 30-1). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

The record reflects that the plaintiff frequently visited the Danbury Hospital Emergency Room ("ER") and the Seifert & Ford Family Community Health Center, which appears to be affiliated with Danbury Hospital. The first medical record is from the plaintiff's visit to the ER on March 23, 2007. (Tr. 494). Treatment notes indicate that she presented "very lethargic" with a history of uncontrolled diabetes. (*Id.*). Her glucose level was 460. (Tr. 496). Over the next three years, the plaintiff presented at the Danbury Hospital ER on multiple occasions, complaining of abdominal pain, (Tr. 502, 523), pain under her left arm and right groin, (Tr. 515), and a yeast infection and cold. (Tr. 549). Her next visit related to her alleged impairments appears to have been on February 2, 2011, at which time she presented with low blood sugar, blurred vision, tingling fingers, headache, neck pain, abdominal pain and nausea. (Tr. 559). Treatment notes reflect that her chief complaint was abdominal pain. (Tr. 561).

The plaintiff thereafter returned to the ER for various treatments. She was treated for eye redness in April 2011, (Tr. 571), underwent an endoscopy in May 2011, (Tr. 577), received a gynecological ultrasound in June 2011, (Tr. 580), was treated for chest pain in August 2011, (Tr. 587, 597), and was treated for a benign laryngeal cyst in September and November 2011. (Tr. 612, 703). At her visit to the Seifert & Ford Family Community Health Center on November 4, 2011, the plaintiff did not have any chest or abdominal pain. (Tr. 705). Treatment notes reflect that she had not been compliant with her diabetes medication. (*Id.*). Due to her complaints of continuing chest pain, the plaintiff had a coronary angiography and LV angiography in January 2012. (Tr.

614). She returned to the Seifert & Ford Family Community Health Center in March 2012 due to chest, knee, abdominal, and pelvic pain. (Tr. 709-10).

In April and May 2012, the plaintiff went to the ER with complaints of head congestion, (Tr. 618), swelling of her hands and feet, and a sore throat, which she believed might be coxsackie disease. (Tr. 626-27). Treatment notes from the plaintiff's May 21, 2012 visit to Seifert & Ford Family Community Health Center indicate that the plaintiff's fibromyalgia had improved but her diabetes remained uncontrolled. (Tr. 716 ("Poor DM controlled")).

The remainder of the plaintiff's medical records from 2012 are for other conditions. In May 2012, the plaintiff had a colonoscopy. (Tr. 635). In July 2012, she twice went to the ER with complaints of chest pain, (Tr. 638, 649), and she had an x-ray, which revealed no evidence of active cardiopulmonary disease. (Tr. 654). In August 2012, she presented to Dr. Jason Gajraj with complaints of a headache and neck ache. (Tr. 753). At that appointment, treatment notes indicate her history of being "fatigued with prolonged activities." (Tr. 754). In August 2012, she complained of an abscess and chest pressure. (Tr. 666). In September 2012, she reported (and was treated) for a sinus infection, congestion, and chest pain. (Tr. 724). Finally, in October 2012, she again indicated she was experiencing chest pain. (Tr. 728). Treatment notes reflect a diagnosis that the chests pains were likely musculoskeletal and a referral for physical therapy. (Tr. 730).

After the medical records from October 2012, there is a gap in the plaintiff's treatment until a visit to the Danbury Hospital ER on September 17, 2013. (Tr. 733). At that appointment, the plaintiff presented for evaluation and treatment of "generalized point tenderness over her cervical spine, lumbar spine, knees and ankles." (Tr. 733-34). Treatment notes indicate her history of fibromyalgia and that she had been maintained on Cymbalta, but that she had not been on that

medication for one year after moving to South Carolina in October 2012. (Tr. 734).[2] The treatment notes also reflect that the plaintiff had been off her diabetes and anti-hypertensive medications except for Lisinopril for the past year. (Tr. 734). Dr. Jason Gajraj prescribed medication. (Tr. 735).

At an endocrine consultation for the plaintiff's diabetes with Dr. Guillermo Pons, M.D., on September 30, 2013, the plaintiff complained of foot pain while walking. (Tr. 487). Treatment notes reflect that the plaintiff "is afraid of needles and is reluctant to start on insulin." (*Id.*). The plaintiff had blurred vision but no dryness, no neck pain, no chest pain, no back pain, no muscle weakness, no muscle aches, no headache, no tremors, no numbness, and no burning sensation. (*Id.*). An examination revealed that she had normal muscle strength and no arthropathy. (Tr. 489). Her "[feet were] onychomycosis, but not swollen, not tender, not erythematous" and had "no ulcerations." (*Id.*). A "sensory exam [for both feet] showed normal vibratory sensation at the level of the toes and normal position sense at the level of the toes." (*Id.*). The plaintiff's motor exam was also normal, with normal deep tendon reflexes and no tremors. (*Id.*). Dr. Pons noted that "leg pain is unusual in a patient who does not exhibit any signs of peripheral neuropathy"; "[i]n fact there is no evidence to suggest pseudo claudication syndrome." (Tr. 490).

That same day, the plaintiff presented at the Danbury Hospital ER complaining of chest pain, beginning in her left chest area and radiating to her left arm. (Tr. 695). On examination, the plaintiff had no myalgia, muscle weakness, joint pain, back pain, or abdominal pain. (Tr. 697). She had a regular heart rate and rhythm, no murmurs, positive reproducible tenderness to her left mid to lower sternal border, and no edema in her bilateral lower extremities. (Tr. 697, 701).

---

[2] Dr. Gajraj noted that the plaintiff was "seeking to re-establish care" after moving back to Connecticut one week earlier. (Tr. 734). The record does not reflect when the plaintiff initially moved to South Carolina; however, from these statements and the lack of medical records in Connecticut between October 2012 and September 17, 2013, it appears that she lived there from approximately October 2012 to September 10, 2013.

Approximately one week later, the plaintiff saw Dr. Gajraj for her diabetes. (Tr. 743-44). Treatment notes reflect that the plaintiff has a severe phobia of needles and had not taken the Lantus Solostar, an insulin pen, prescribed to her. (*Id.*). Dr. Gajraj recommended that the plaintiff try using the Novolog Flexpen, a different insulin pen; the Diabetes Education department also recommended alternative medications, but the record does not reflect whether their recommendations also required needles. (Tr. 744). Treatment notes indicate that the plaintiff had generalized body aches related to fibromyalgia that had improved with use of Robaxin. (Tr. 744). The plaintiff returned to Dr. Gajraj on October 22, 2013, complaining of bilateral leg, knee, and ankle pain. (Tr. 738-39). Treatment notes indicate her history of fibromyalgia, which had been maintained on Cymbalta; the plaintiff discontinued her use of Robaxin due to drowsiness. (Tr. 738). As to the plaintiff's diabetes, her cousin had been administering her Novolog Flexpen twice daily. (Tr. 739). The plaintiff rated her pain level at ten out of ten; her hips, ankles, knees and feet were tender upon examination. (Tr. 740).

On November 12, 2013, the plaintiff presented to Dr. Gajraj with bilateral lower extremity pain, numbness and tingling. (Tr. 133-34). The plaintiff reported decreased sensation of both feet. (*Id.*). Treatment notes indicate that the plaintiff had issues administering insulin due to needle phobia but did well with a trial of Auto Shield pen needles. (Tr. 134). Because those needles were not covered by the plaintiff's insurance, however, the physician recommended that the plaintiff start back on Lantus Solostar. (Tr. 135). The plaintiff returned to the ER on December 3, 2013, for weakness, (Tr. 865), and again on December 30, 2013, for severe pain and buckling of her right knee. (Tr. 100). An x-ray revealed "mild mexlial tibiofemoral joint narrowing." (*Id.*).

Throughout 2014, the plaintiff continued to visit the Danbury Hospital ER and Seifert & Ford Community Health Center. On January 30, 2014, the plaintiff reported bilateral knee pain,

which radiated to her right calf and ankle; she rated her pain as a ten out of ten. (Tr. 108-09). Treatment notes reflect that the plaintiff reported she was still able to walk independently but had to change position "all the time." (Tr. 108). The pain interfered with her sleep, was worse with movement, and was mildly relieved with rest. (*Id.*). On examination, the "appearance" of the plaintiff's knees was normal, with no swelling or warmth. (Tr. 109). The plaintiff's knees were tender upon palpation, and her range of motion was restricted, though "hard to tell as the patient is not very cooperative with the exam due to the pain." (*Id.*). The physician also indicated that "the degree of pain is out of proportion to the physical examination and x-ray finding. (*Id.*).

On February 14, 2014, the plaintiff saw a physician for diabetes management. (Tr. 130). The plaintiff reported blurry vision with changes in her blood sugar, numbness and tingling in her feet, and bilateral knee pain. (*Id.*). She was not taking insulin. (*Id.*). Treatment notes indicate that the plaintiff had "uncontrolled diabetes in the setting of medication non-compliance." (Tr. 131). Treatment notes from May 1, 2014 similarly note that the plaintiff was "poorly controlled and not compliant" with her insulin. (Tr. 138-39). On May 16, 2014, she presented with persistent lower back pain. (Tr. 150). Treatment notes indicate that she had been compliant with her medication. (*Id.*). On May 29, 2014, she complained of arm pain, extending from her shoulders to her fingers. (Tr. 116). She returned on June 13, 2014, this time complaining of bilateral pain radiating from her thighs to her toes. (Tr. 126). She reported the pain as sharp, burning, and shooting, and explained that it was exacerbated by walking. The physician noted that the plaintiff presented with "lower extremity neuropathic pain," "polyphagia" and "visual changes in the setting of non-compliance with her diabetes medication regimen." (*Id.*). The plaintiff reported similar pain on June 17, 2014, although this time accompanied by drowsiness. (Tr. 90-91).

On August 7, 2014, the plaintiff went to the Seifert & Ford Community Health Center for severe neck and leg pain, which she described as sharp and throbbing, radiating to her left shoulder and jaw. (Tr. 80). She rated her pain as a ten out of ten. (*Id.*). On examination, the plaintiff had "decreased sensation in lower extremities bilaterally, sensation decreased from mid-calf downwards." (Tr. 81). She returned the next day with the same symptoms. (Tr. 1000). She was diagnosed with cervical radiculopathy. (Tr. 1003). She returned the next day (for the third day in a row) complaining of neck pain and upper back pain. (Tr. 1005). The plaintiff was noted to have left lip and left lower facial swelling and to be in moderate distress. (*Id.*).

In August 2014, the plaintiff was diagnosed with Bell's Palsy. (Tr. 69). She received treatment for that condition for the remainder of 2014. On September 3, 2014, the plaintiff saw Dr. John Murphy at the Western Connecticut Health Network Neurology Clinic. (Tr. 69, 71). The plaintiff presented with a left facial droop and slurred speech. (Tr. 69). The plaintiff also complained of chronic upper back and neck pain, which she described as "pulling, grinding," as well as tingling and numbness in both feet. (*Id.*). On September 12, 2014, the plaintiff had a follow-up appointment. (Tr. 66). She still had neck pain and rated it as a five out of ten. (*Id.*). On October 6, 2014, Dr. Ralph Tremaglio noted that the plaintiff's diabetes was much better controlled. (Tr. 62). On November 13, 2014, a physician noted that the plaintiff's Bell's Palsy was "slightly better," her diabetes was stable, and her pain was under control with daily narcotics. (Tr. 53). Treatment notes from the plaintiff's November 20, 2014 and December 8, 2014 visits to Dr. Hindola Konrad reflect a diagnosis of non-proliferative diabetic retinopathy and cataracts. (Tr. 163, 920).

C.     <u>OPINION EVIDENCE</u>

Dr. Jason Gajraj, M.D., completed a functional capacity assessment. (Tr. 843). Dr. Gajraj

diagnosed the plaintiff with severe Type II diabetes, fibromyalgia, depression/anxiety, hypertension, and GERD. (*Id.*). Dr. Gajraj opined that the plaintiff was unable to work for "12 months or more." (*Id.*). According to Dr. Gajraj, the plaintiff's "neuropathy and fibromyalgia cause[d] [her] pain, prevent[ed] [her] ability to sit, stand > 2 hrs at a time; fatigue." (*Id.*). Dr. Gajraj explained that the plaintiff's "diabetes [was] *very* difficult to control," and that "recent stresses have worsened the physical symptoms of [her] fibromyalgia." (*Id.*).

At the time he rendered this opinion on November 12, 2013, Dr. Gajraj had last seen the plaintiff that same day. (Tr. 844). He opined that the plaintiff could sit and stand for two hours with normal breaks and that she could walk one hour with normal breaks; she could occasionally lift ten pounds, but never lift between eleven and twenty-five pounds. (Tr. 845). She could occasionally carry ten pounds, but never carry between eleven and twenty-five pounds. (*Id.*). The plaintiff could use her hands for repetitive actions, including simple grasping and fine manipulation, but she could not push and pull arm controls. (*Id.*). She also could not use her feet repetitively and could never bend, squat, crawl, climb. (*Id.*). She could, however, occasionally reach. (*Id.*).

Dr. Ralph Tremaglio also provided an opinion. In a treatment note from October 21, 2014, Dr. Tremaglio noted that the plaintiff had been their patient "for many years," and that she suffered from poorly controlled Type II diabetes mellitus with peripheral neuropathy requiring insulin, severe hypertension, chronic pain, depression and fibromyalgia, Bell's Palsy, and hyperlipidemia. (Tr. 903). He opined that the plaintiff was "completely disabled by these conditions." (Tr. 904). According to Dr. Tremaglio, the plaintiff's "chronic pain prevent[ed] physical work that entails sitting, standing or attention for more than one hour daily"; "some of the medications also cause side effects such as sedation and cognitive dysfunction that are debilitating." (*Id.*). Dr. Tremaglio

also filled out a functional assessment on October 24, 2014, in which he opined that the plaintiff's conditions prevented her from working and that she would be unable to work for "12 months or more." (Tr. 910-11). Dr. Tremaglio opined that she could occasionally lift five pounds, occasionally carry five pounds, and she could use her hands for simple grasping but not for push and pull arm controls or fine manipulation. (Tr. 912-13). Further, the plaintiff could never use her feet repetitively for pushing and pulling leg controls, and could never bend, squat, crawl, climb, or reach, or be around unprotected heights, moving machinery, marked changes in temperature and humidity, automotive equipment, or dust and fumes. (Tr. 913-914).

Larry R. Korn, a consultative examiner, met with the plaintiff on March 6, 2013. (Tr. 476-79). Dr. Korn noted that the plaintiff was "seemingly a little lethargic with somewhat unusual movements and mannerisms evidently as part of her pain displays." (Tr. 477). His report indicates that the plaintiff's "movement [was] antalgic," she was "very slow and laborious about rising from a chair and also with getting on and scooching back on the exam table," and she was not using any assistive device. (*Id.*). Her walk was slow on pace, slightly widened, stiff, and antalgic. (*Id.*). Dr. Korn also noted pain displays with all movements of her shoulders, elbows, wrists and hands, as well as with any sort of light manipulation of upper and lower extremities, including reflex testing. (Tr. 478). Examination of the plaintiff's shoulders, elbows, wrists, hands, and lower extremities was benign. (*Id.*). Her hips and ankles appeared unremarkable, the general curvature of her spine was normal, and her pelvis was level. (*Id.*). She demonstrated lumbar flexion and extension that would be considered mildly diminished. (*Id.*). Dr. Korn also noted that the plaintiff had limited abilities to tandem walk and heel-toe walk due to her pain. (*Id.*). He explained that he could not confirm muscle weakness due to her pain displays, but that there did not appear to be any sensory loss. (*Id.*). Dr. Korn diagnosed the plaintiff with chronic pain syndrome with a predominant, if not

exclusive, psychological component. (*Id.*). He stated, "[T]here are no objective findings today that would point towards anything other than the diagnosis given above." (Tr. 479).

D.    THE ALJ'S DECISION

Following the five-step evaluation process,[3] the ALJ found that the plaintiff's date last insured under the Social Security Act was June 30, 2013. (Tr. 12). The ALJ then found that the plaintiff had engaged in substantial gainful activity during the alleged disability period, from January 1, 2011 to December 31, 2011. (Tr. 13, citing 20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b), and 416.971 *et seq.*). If a claimant is engaging in substantial gainful activity, she will not be found disabled. *See* 20 C.F.R. § 404.1520(a)(4). The ALJ here, however, found that there was a continuous twelve-month period from the plaintiff's alleged onset date of June 1, 2007 to the date of the ALJ's decision during which the plaintiff did not engage in substantial gainful activity. (Tr. 13; *see* 20 C.F.R. § 404.1509 (To be found disabled, an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months")). The ALJ thus noted that the "remaining findings address the period(s) the [plaintiff] did not engage in substantial gainful activity," (Tr. 13), and continued to step two of the five-step process.

---

[3] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater,* 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

At steps two and three, the ALJ concluded that the plaintiff had the severe impairments of diabetes mellitus, neuropathy, Bell's palsy, and fibromyalgia, (Tr. 13, citing 20 C.F.R. §§ 404.1520(c), 416.920(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926)). He also found that the plaintiff's mild coronary artery disease, obesity, and adjustment disorder were nonsevere impairments. (Tr. 13-15). The ALJ then concluded, at step four, after careful consideration of the entire record, that the plaintiff had the residual functional capacity ["RFC"] to perform light work, but with the following limitations: "she c[ould] stand/walk for 2-4 hours and sit for 6 hours out of an 8-hour period"; "she require[d] a sit/stand option wherein she c[ould] sit for 30 minutes, alternate to a standing position for 5 minutes, then resume sitting"; "she c[ould] occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds"; "she c[ould] occasionally balance, stoop, and crouch, and never knee or crawl"; "she c[ould] frequently handle and finger"; and "she c[ould] tolerate no work in exposure to temperature extremes, humidity, or wetness." (Tr. 16).

As a result of this RFC determination, the ALJ found, at step four, that the plaintiff was able to perform her past relevant work as a call center worker. (Tr. 23, citing 20 C.F.R. § 404.1565). Accordingly, the ALJ concluded that the plaintiff was not under a disability from June 1, 2007, through the date of the decision, September 4, 2015. (Tr. 23-24, citing 20 C.F.R. § 404.1520(g)).

III.     STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported

by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

IV.     DISCUSSION

The plaintiff contends that the ALJ's RFC assessment was "incomplete and unsupported by medical evidence." (Pl.'s Mem. at 2). Specifically, the plaintiff asserts that the ALJ erred in assigning little weight to the medical opinions of Drs. Gajraj and Tremaglio, in failing to properly assess the medical opinion of consultative examiner Dr. Korn, and in not providing an adequate

explanation of his assessment of the opinion of the state agency examiner Dr. Lorenzo. (Pl.'s Mem. at 4-8). Additionally, the plaintiff argues that the ALJ's RFC assessment was "incomplete," in that the ALJ did not include any limitations based on the plaintiff's reported fatigue and pain. (Pl.'s Mem. at 8-10). The plaintiff also argues that the ALJ erred in his credibility finding. (Pl.'s Mem. at 12-13). Finally, the plaintiff maintains that the Commissioner "failed to complete the record" by not obtaining medical records from an earlier application. (Pl.'s Mem. at 13-14).

The defendant responds that substantial evidence supports the ALJ's RFC assessment. (Def.'s Mem. at 4). According to the defendant, the ALJ properly weighed the opinion evidence, considered the plaintiff's allegations of disability and incorporated significant limitations into his RFC finding. (Def.'s Mem. at 7-17). The defendant also argues that the ALJ based his decision on a complete record. (Def.'s Mem. at 18-19).

A.     <u>THE ALJ DID NOT ERR IN HIS EVALUATION OF THE OPINION EVIDENCE AND SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S RFC ASSESSMENT</u>

The plaintiff first argues that the ALJ improperly evaluated the opinions of treating physicians Drs. Gajraj and Tremaglio, consultative examiner Dr. Korn, and state agency examiner Dr. Lorenzo. (Pl.'s Mem. at 4-8). The plaintiff does not argue how much weight each opinion should have been given. Instead, the plaintiff maintains that the ALJ could not have formed an RFC assessment without giving significant weight to a medical source opinion. (Pl.'s Mem. at 8). The defendant responds that the ALJ appropriately considered the opinions of each of the physicians, and that substantial evidence supports RFC assessment. (Def.'s Mem. at 4, 7-12).

1.     <u>THE ALJ PROPERLY EVALUATED THE OPINION EVIDENCE</u>

The Court agrees with the defendant that the ALJ did not err in his evaluation of these physicians' opinions. Taking each in turn, in Dr. Gajraj's November 12, 2013 medical source

statement, he opined that the plaintiff could lift or carry ten pounds occasionally; could sit and stand for an hour; and could walk for two hours out of an eight-hour period. (Tr. 844-45). Additionally, Dr. Gajraj opined that the plaintiff had no limitations in her ability to grasp or manipulate; however, she had limited ability to use her upper and lower extremities to push/pull controls due to diabetic neuropathy. (Tr. 845). She also could never bend, squat, crawl or climb and could only occasionally reach. (*Id.*). The ALJ afforded "little weight" to the opinion of treating physician Dr. Gajraj on grounds that "Dr. Gajraj's treatment records do not support his findings that the [plaintiff's] exertional abilities are as limited as he has indicated," "there is no objective evidence supporting [Dr. Gajraj's] almost universal prohibition against postural functioning," and his report—which indicated that the plaintiff's diabetes is "very difficult to control" and her fibromyalgia "had worsened with stressors"—is "extremely vague." (Tr. 20).

Here, because Dr. Gajraj is a treating physician, his opinion "as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). Where, as here, the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). The ALJ must then give "good reasons" for the weight assigned to a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R.

§ 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

The ALJ gave "good reasons" for giving Dr. Gajraj's opinion "little weight." As the ALJ noted, neither Dr. Gajraj's own treatment records nor the plaintiff's prior medical records reflect the level of functional limitations ascribed by Dr. Gajraj to the plaintiff. Preliminarily, at the time Dr. Gajraj began treating the plaintiff, she had been off her medications—for both diabetes and fibromyalgia—for a year, and, at the time he provided his opinion, he had only been seeing her for approximately two months. Further, the medical records reflect that the plaintiff's diabetes was uncontrolled in part because of her noncompliance with her medication, (Tr. 743-44, 144, 134-35), and that, while she experienced tenderness in her spine, knees, and ankles, and "generalized body aches" due to fibromyalgia, Dr. Gajraj treated her with medication and did not recommend more intensive treatment. (Tr. 734-35, 738, 740, 744). Lastly, the medical records do not corroborate the exertional limitations Dr. Gajraj attributed to the plaintiff. Indeed, treatment notes from November 12, 2013, the same day as Dr. Gajraj's medical source statement, reflect his notation that the plaintiff had "5/5 strength" in all extremities. (Tr. 135). Moreover, as the ALJ noted, none of the plaintiff's earlier medical records—whether treatment notes or diagnostic evidence—reflect any loss of strength or problems with the plaintiff's ability to sit or stand for prolonged periods. Accordingly, the ALJ did not err in his treatment of Dr. Gajraj's opinion, and he properly explained his reasons for assigning his opinion "little weight."

The ALJ similarly stated "good reasons" for giving Dr. Tremaglio's opinions "little weight." Dr. Tremaglio provided opinions on October 21, 2014 and October 24, 2014. At the outset, the ALJ properly gave Dr. Tremaglio's statement that the plaintiff was "completely disabled" and unable to work for "12 months or more" "little weight." These statements are on an

issue reserved to the Commissioner, and thus not entitled to any weight or special significance. *See* 20 C.F.R. § 404.1527(d)(a) (an opinion concerning the ultimate issue of disability under the Social Security Act is reserved to the Commissioner); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."); Social Security Ruling (SSR) 96-5p, 1996 WL 374183 (treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight).

Additionally, the ALJ properly discounted Dr. Tremaglio's opinion as to the plaintiff's functional limitations. On October 21, 2014, Dr. Tremaglio stated that the plaintiff's "chronic pain prevent[ed] physical work that entail[ed] sitting, standing, or attention for more than one hour daily." (Tr. 904). On October 24, 2014, Dr. Tamaglio opined that the plaintiff could never stand, walk or sit; could occasionally lift and carry five pounds; could use her hands for simple grasping but could not use her hands for push and pull arm controls or fine manipulation; could never use her feet repetitively for pushing and pulling leg controls; and could never bend, squat, crawl, climb, or reach, or be around unprotected heights, moving machinery, marked changes in temperature and humidity, automotive equipment, or dust and fumes. (Tr. 912-914). The ALJ gave this opinion "little weight" because it was based on the plaintiff's "self-reports and not on any clinical observations or diagnostic testing." (Tr. 19). The ALJ also noted that Dr. Tremaglio's opinion was "inconsistent" with other substantial evidence in that there was little objective evidence to support "the extreme limitations articulated by Dr. Tremaglio." (Tr. 21).

This Court's review of the medical records corroborates the ALJ's findings. Neither Dr. Tremaglio's treatment notes nor the plaintiff's other prior medical records reflect that the plaintiff was so limited. Indeed, Dr. Tremaglio's October 6, 2014 treatment notes, from shortly before he gave his opinions, reflect that the plaintiff's diabetes was "much better controlled than before."

(Tr. 62). On examination, the plaintiff's right lower quadrant was mildly tender. (Tr. 61). Dr. Tremaglio prescribed oxycodone for back pain. (*Id.*). Before that, in September 2014, the plaintiff rated her pain as a five out of ten, and Dr. Tremaglio noted that the plaintiff's neck pain was "likely musculoskeletal." (Tr. 66-67). Nothing in the remaining records—whether treatment notes or diagnostic tests—supports a finding that the plaintiff had such restrictive limitations. In fact, the diagnostic evidence suggests the opposite. For instance, in January 2014, at an appointment where the plaintiff complained of bilateral knee pain, the physician indicated that "the degree of pain is out of proportion to the physical examination and x-ray finding." (Tr. 109). Because Dr. Tremaglio's opinions were inconsistent with the record as a whole, it was thus appropriate for the ALJ to give his opinions "little weight," and the ALJ provided "good reasons" for doing so.

The plaintiff next argues that the ALJ erred in his treatment of Dr. Korn, the consultative examiner. Dr. Korn indicated that the plaintiff's "movement is antalgic," she is "very slow on pace, slightly widened, stiff and antalgic," she demonstrates pain "with all movements of her shoulders, elbows, wrists and hands, as well as with any sort of light manipulation of upper and lower extremities," and she has limited abilities to tandem walk and heel-toe walk due to pain. (Tr. 477-78). Dr. Korn diagnosed "chronic pain syndrome with predominant, if not exclusive, psychological component" and noted that "there are no objective findings today that would point towards anything other than th[is] diagnosis." (Tr. 479). The ALJ gave "mixed weight" to Dr. Korn's opinion, specifically declining to attach great weight to the finding that the plaintiff's chronic pain was predominantly, if not exclusively, psychological in nature. (Tr. 18).

The plaintiff argues that the ALJ improperly failed to "point[] to that part of the opinion that he fe[lt] was worthy of some weight." (Pl.'s Mem. at 5). This argument is unavailing. Contrary to the plaintiff's argument, the ALJ made clear that he found Dr. Korn's "clinical observations . .

. instructive," but did not attach "great weight" to Dr. Korn's opinion that the plaintiff's chronic pain was psychological in nature. (Tr. 18). Further, the ALJ's treatment of Dr. Korn's opinion supports the plaintiff's argument that she had physical limitations. The ALJ did not credit Dr. Korn's finding that the plaintiff's pain was psychological, instead crafting an RFC that included physical limitations. (*See* Tr. 18 ("Developments in the record, however, show that the [plaintiff] does have some physical limitations, even if there is some symptom magnification.").

Finally, the plaintiff argues that the ALJ erred in his assessment of Dr. Lorenzo's opinion, the state agency physician who reviewed the plaintiff's application upon reconsideration. The plaintiff points out that the ALJ assigned her opinion "some little weight," which appears to be a typographical error. (Tr. 21). She then argues that the opinion is "vague" and "incapable of review." (Pl.'s Mem. at 6. The Court disagrees. "Courts have found typographical errors to be harmless if it is obvious from the opinion as a whole that the error is typographical and not substantive." *Van Valkenberg ex el. B.G. v. Astrue*, 2010 WL 2400455, at *13 (N.D.N.Y. May 27, 2010) (citing cases). In reviewing the remainder of the ALJ's discussion of Dr. Lorenzo's opinion, it is evident that he intended to give Dr. Lorenzo's opinion "some weight" or "little weight"; regardless, the ALJ clearly adopted a portion of Dr. Lorenzo's opinion when he found that the plaintiff was limited to light exertional activity.  Dr. Lorenzo opined that the plaintiff could occasionally lift and carry 20 pounds; could frequently lift and carry ten pounds; could stand/walk and sit, each, for about six hours of an eight-hour period; could occasionally climb ramps, stairs, ladders, ropes or scaffolding; could frequently balance, stoop, kneel, crouch, and crawl; and had no environmental limitations. (Tr. 264-65). The ALJ considered this opinion, which contained the exertional requirements for light work;[4] however, instead of adopting Dr. Lorenzo's opinion in

---

[4] "Light work" is defined in SSA regulations as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. § 404.1567(b).

full, the ALJ found additional limitations based on the medical evidence in the record. (*See* Tr. 21 ("although the [plaintiff] is limited to light exertional activity, developments in the record show that she has greater postural limitations and some environmental restrictions.")). Accordingly, the Court finds no error of law in the ALJ's treatment of the opinion evidence.

## 2.  THE RFC ASSESSMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

The plaintiff argues that the ALJ did not rely on any physicians' opinions in fashioning the plaintiff's RFC, instead improperly substituting his own opinion for that of a medical professional; thus, according to the plaintiff, the RFC could not be supported by substantial evidence. (Pl.'s Mem. at 7-8). The plaintiff additionally argues that the ALJ did not incorporate the plaintiff's complaints of fatigue and pain into the RFC. (Pl.'s Mem. at 8-11). The defendant argues that substantial evidence supports the RFC. (Def.'s Mem. at 12-13).

The plaintiff's RFC is "the most she can still do despite her limitations" and is determined "based on all the relevant evidence in [the] case record[,]" namely, "all of the relevant medical and other evidence."  20 C.F.R. § 404.1527(a)(1), (3); *see also Gonzales v. Berryhill*, No. 3:17-CV-1385 (SALM), 2018 WL 3956495, at *14 (D. Conn. Aug. 17, 2018). "[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Social Security Ruling ["S.S.R."] 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). Before classifying a plaintiff's RFC based on exertional level, an ALJ "must first identify the individual's functional limitations or restrictions and assess [] her work-related abilities on a function-by-function basis[]."  *Id.*  (internal quotation marks omitted).

However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]'"

*Id.* at 178 n. 3 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (citing 42 U.S.C. § 405(g)) (summary order); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, as discussed above, the ALJ concluded, after careful consideration of the entire record, that the plaintiff had the RFC to perform light work, but with the following limitations: "she can stand/walk for 2-4 hours and sit for 6 hours out of an 8-hour period"; "she requires a sit/stand option where[] she can sit for 30 minutes, alternate to a standing position for 5 minutes, then resume sitting"; "she can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds"; "she can occasionally balance, stoop, and crouch, and never knee or crawl"; "she can frequently handle and finger"; and "she can tolerate no work in exposure to temperature extremes, humidity, or wetness." (Tr. 16).

Contrary to the plaintiff's contention, the ALJ did not "cherry pick[]" the record and substitute his opinion for medical opinions in the record. (Pl.'s Mem. at 13). Moreover, the ALJ appropriately considered the plaintiff's fatigue in formulating the RFC.[5] The ALJ's RFC findings are supported by the treatment notes, the lack of significant diagnostic findings, the opinions of

---

[5] The plaintiff argues that the ALJ erred by not including a limitation due to the plaintiff's fatigue. (Pl.'s Mem. at 9-10). The ALJ, however, did not find the plaintiff's fatigue to be a severe impairment. Further, the ALJ acknowledged the plaintiff's fatigue in the decision, (Tr. 19), and incorporated the plaintiff's symptoms in the RFC assessment. Finally, the plaintiff has pointed to no additional medical evidence supporting her claim that fatigue had a disabling effect. The medical records referencing the plaintiff's fatigue—from 2007, 2010, 2012, and 2015—do not support additional limitations. (*See* Tr. 494-95 ("no apparent distress except for lethargy"); Tr. 710 ("fatigue" noted as symptom); Tr. 753-54 (the plaintiff becomes fatigued "with prolonged activity"); Tr. 1034 ("appeared like [the plaintiff] was falling asleep while on the treadmill")). Moreover, though Dr. Gajraj opined that the plaintiff's neuropathy and fibromyalgia caused "fatigue," as noted above, the ALJ did not err in giving Dr. Gajraj's opinion "little weight," and a review of Dr. Gajraj's treatment notes reveals that the only reference to fatigue is from when he discontinued the plaintiff's use of Robaxin due to drowsiness. (Tr. 733-35, 743-44, 738-40, 133-35). Thus, based on the underlying record, the Court cannot conclude that the plaintiff's RFC should have included additional limitations beyond those found by the ALJ, based on the plaintiff's reported fatigue.

consultative examiner Dr. Katz, the opinion of state agency examiner Dr. Lorenzo, and the portion of Dr. Tremaglio's opinion that the ALJ credited.

As discussed above, treatment notes and diagnostic evidence relating to the plaintiff's diabetes, fibromyalgia, and back, neck, chest, knee, leg, and arm pain were consistent with the level of functioning the ALJ assessed in his decision. Nothing in the treatment notes suggests that the ALJ should have imposed additional exertional limitations. *See* Tr. 487-90 ("normal muscle strength"; "normal motor exam"; "normal vibratory sensation and position sense at the level of the toes"; the plaintiff reported no neck, chest, or back pain, nor muscle weakness, aches, numbness, or burning sensation); Tr. 744 ("generalized body aches" and cervical, lumbar, and bilateral knee pain with "ankle point tenderness"); Tr. 740 (the plaintiff's hips, ankles, knees and feet were tender upon examination); Tr. 108 (the plaintiff was still able to walk independently but must change position "all the time"); Tr. 109 (the plaintiff's knees were tender upon palpation; her range of motion was restricted); Tr. 126 (the plaintiff presented with "lower extremity neuropathic pain"); Tr. 1003 (diagnosed with cervical radiculopathy); Tr. 62 (the plaintiff's diabetes was "much better controlled"). Further, the objective diagnostic evidence does not support more than mild limitations. Tr. 100 (x-ray revealed "mild mexlial tibiofemoral joint narrowing"); Tr. 109 ("the degree of pain is out of proportion to the physical examination and x-ray finding").

The ALJ's conclusion that the plaintiff could do light work with additional limitations is also supported by Dr. Katz's findings and conclusions. Dr. Katz examined the plaintiff and noted that she walked with an antalgic, slightly widened, stiff gait, demonstrated mildly diminished lumbar flexion and extension, and had limited ability to tandem walk and heel-toe walk. (Tr. 477-78). His examination also revealed that the plaintiff did not appear to have any sensory loss, her

hips and ankles appeared unremarkable, the general curvature of her spine was normal, her pelvis was level, and her shoulders, elbows, wrists, hands, and lower extremities were benign. (*Id.*).

Moreover, the ALJ's RFC assessment is supported by the state agency physicians. Dr. Lorenzo opined that the plaintiff could occasionally lift and carry twenty pounds; could frequently lift and carry ten pounds; could stand/walk and sit for six hours of an eight-hour period; could occasionally climb ramps, stairs, ladders, ropes or scaffolding; and could frequently balance, stoop, kneel, crouch, and crawl. (Tr. 264-65). The ALJ incorporated these findings into his RFC assessment but found additional limitations based on the record as whole. Finally, the ALJ credited Dr. Tremaglio's finding that the plaintiff could not tolerate exposure to temperature extremes or dust and fumes, and he incorporated that limitation into his RFC assessment. (Tr. 21).

The ALJ thus accounted for the plaintiff's physical limitations in the RFC by concluding that she was limited to light work with additional limitations. As discussed above, the treatment notes and consultative opinions do not support more significant restrictions. Therefore, the Court finds that the ALJ did not err and that his decision, as discussed above, is supported by substantial evidence. *See Hanson v. Comm'r of Soc. Sec.*, No. 15-CV-150 (GTS)(WBC), 2016 WL 3960486, at *12 (N.D.N.Y. June 29, 2016) ("Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence . . . Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record."), *report and recommendation adopted sub nom. Hanson v. Colvin*, No. 15-CV-150 (GTS) (WBC), 2016 WL 3951150 (N.D.N.Y. July 20, 2016)).

### B. THE ALJ DID NOT ERR IN HIS CREDIBILITY FINDING

In his decision, the ALJ concluded that, although the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . the [plaintiff's]

statements concerning the intensity, persistence and limited effects of these symptoms are not entirely credible[.]" (Tr. 21). In support of this finding, the ALJ noted several inconsistencies: 1) "the [plaintiff] performed work activity following the alleged onset date – at times in excess of substantial gainful activity," a fact "inconsistent with the [plaintiff's] representations that she has been unable to perform any sort of work since June 1, 2007"; 2) at the hearing, the plaintiff gave "conflicting accounts of the status of her vision," "testified that she was not compliant in Insulin treatments because of insurance problems" when "the record shows that she stopped taking Insulin because she is afraid of needles," and alleged "significant limitations on her exertional abilities," which conflicted with the "longitudinal record"; 3) "the record [] raises questions concerning the [plaintiff's] compliance with medical treatment"; and 4) "there is a strong current running throughout the record showing that the [plaintiff] tends to exaggerate her pain symptoms." (Tr. 21-22). The plaintiff takes issue with each of these findings and contends that the ALJ erred by not explaining which of the plaintiff's statements he found credible. (Pl.'s Mem. at 12).

The record evidence supports the ALJ's statements. As noted by the ALJ, the record reflects that the plaintiff performed work activities in 2011, following the alleged onset date, (Tr. 192-93, 381-82), that she gave conflicting accounts on her vision, (Tr. 190-91, 204), and that she refused to take Insulin because of her fear of needles. (Tr. 670, 754). Dr. Korn diagnosed "chronic pain syndrome with predominant, if not exclusive, psychological component," (Tr. 477-78), and Dr. Pons observed that the plaintiff's complaints of leg pain were "unusual" because she did not "exhibit any signs of peripheral neuropathy," (Tr. 490); both statements support the ALJ's finding that the plaintiff tended to exaggerate her pain symptoms. Moreover, contrary to the plaintiff's argument, the ALJ did not need to detail which of the plaintiff's statements he found credible. An ALJ need only provide "specific reasons for the finding on credibility, supported by the evidence

in the case record," from which the Court can "glean the rationale of the ALJ's decision." *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013). As noted above, the ALJ did so here.

The plaintiff also appears to argue that the ALJ did not address the plaintiff's pain. (Pl.'s Mem. at 10 ("[the effects of pain must still be addressed in the RFC . . . The ALJ's failure to do so is remandable error")). This argument has no merit. The ALJ devoted a substantial part of his decision to the plaintiff's fibromyalgia and pain, discussing it first as he reviewed the records and again when he discussed the plaintiff's self-reports of pain in the credibility section. (Tr. 19-23). Indeed, the plaintiff acknowledges as much. (*See* Pl.'s Mem. at 10-11). To the extent the plaintiff is arguing that the ALJ *improperly* evaluated the plaintiff's pain, as discussed in this section and Section IV.A, *supra*, the record does not support such a conclusion.

"It is the role of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including with respect to the severity of a [plaintiff's] symptoms." *Cichocki*, 534 F. App'x at 75 (2d Cir. 2013) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). However, before concluding that the plaintiff is "not a credible reporter of [her] own limitations, the ALJ [must] consider all of the evidence of the record, including [the claimant's testimony] and other statements with respect to [her] daily activities." *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)); *see also* SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996)[6] ("In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including . . . statements and other information provided by treating or examining

---

[6] SSR 96-7p was rescinded and superseded by SSR 16-3p on October 25, 2017. SSR 16-3p, 2017 WL 5180304, at *1 (S.S.A. Oct. 25, 2017). As stated in SSR 16-3p, ALJs apply 16-3p in decisions made on or after March 28, 2016, and "[w]hen a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review." *Id.* The decision was issued in this case on September 14, 2015; accordingly, SSR 96-7p applies.

physicians or psychologists . . . ."). The ALJ's decision is subject to deference as long as he provides specific reasons for his determination, and the "record evidence permits [the Court] to glean the rationale of the ALJ's decision[.]" *Cichocki*, 534 F. App'x at 76.

Because "[c]redibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are 'patently unreasonable[,]'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997), this Court cannot conclude that the ALJ's decision was patently unreasonable in light of the medical record the ALJ reviewed. As discussed above, the ALJ adequately explained his reasons for reaching his conclusion regarding the severity of the plaintiff's impairments, including her reports of pain, and the limitations resulting therefrom that pain. Moreover, the ALJ did not err in discrediting the plaintiff's subjective assessments after he reviewed the medical testimony, the plaintiff's hearing testimony, and the objective medical evidence. *See Tejada v. Apfel*, 167 F.3d 770, 775-76 (2d Cir. 1999); *Scott v. Berryhill*, No. 17-CV-211(JAM), 2018 WL 1608807, at *6 (D. Conn. Mar. 31, 2018).[7] Accordingly, this Court concludes that the ALJ's credibility determination is supported by substantial evidence.

C.     THE ALJ DID NOT FAIL TO DEVELOP THE RECORD

The plaintiff argues that the ALJ "failed to complete the record" by not obtaining medical evidence from her earlier claim for benefits. The defendant argues that the ALJ based his decision on a complete record and was not required to seek out additional evidence. The Court agrees with the defendant.

---

[7] Notably, there was a further inconsistency in the plaintiff's testimony. At her hearing, the plaintiff testified that she could stand in one spot for no more than two minutes, and she could sit for a single stretch of twenty minutes before needing to lay down. (Tr. 202). The plaintiff also testified, however, that she could drive for thirty minutes. (Tr. 195). Thus, the plaintiff's testimony was inconsistent as to how long she could sit. Moreover, the plaintiff's ability to sit for thirty minutes was consistent with the ALJ's finding that the plaintiff required a sit/stand option where she could sit for thirty minutes, alternate to a standing position for five minutes, and then resume sitting.

An ALJ is "required affirmatively to seek out additional evidence only where there are obvious gaps in the administrative record." *Eusepi v. Colvin*, 595 F. App'x. 7, 9 (2d Cir. 2014) (summary order). Such is not the case here. The administrative record includes over 500 pages of the plaintiff's medical records beginning in 2007. (*See* Doc. No. 28). The ALJ is not required to develop the record any further where, as here, the evidence already presented is "adequate for [the ALJ] to make a determination as to disability." *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (summary order) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996). Further, at no time during the hearing did the plaintiff, who was represented by counsel, mention the need for the earlier claim file[8] or that records from South Carolina may be missing. In fact, the plaintiff represented that she did not have insurance in South Carolina so she "couldn't get the treatment [she] needed" and would instead "go to . . . the emergency room." (Tr. 198). Nor has the plaintiff now pointed to specific evidence that was not included in the record but could have influenced the ALJ's decision. Indeed, the plaintiff appears not to know whether any additional records exist. (*See* Pl.'s Mem. at 14-15 ("[a]t the very least it must be determined if there are other records"; "it is likely that the earlier application contains records of [the plaintiff's] treatment while in South Carolina"). Accordingly, the Court finds that the ALJ did not fail to develop the record.

---

[8] The record reflects that the plaintiff previously applied for SSDI and DIB benefits on December 22, 2009. (Tr. 227). Her applications were denied initially on May 14, 2010, and upon reconsideration on August 26, 2010. (*Id.*). She applied again for SSDI and DIB benefits on November 6, 2012 and November 15, 2012, respectively, and both applications were denied on April 12, 2013. (*Id.*). The instant application then followed on October 7, 2013.

V.    <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 29) is *denied*, and the defendant's Motion to Affirm (Doc. No. 31) is *granted.*

Dated this 4th day of December, 2019 at New Haven, Connecticut.

<u>  /s/Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge